**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DOROTHY RIVERA, an individual, EDDY OMAR RIVERA, an individual, and STEVEN CAMBURN, an individual**<br><br>**Plaintiffs,**<br><br>*v.*<br><br>**BOROUGH OF POTTSTOWN, KEITH A. PLACE in his official capacity as Pottstown Director of Licensing and Inspections, and STEPHANIE DROBINS, in her official capacity as a Pottstown Inspector.**<br><br>**Defendants.** | ) | **Case No.:** |

# VERIFIED COMPLAINT

## INTRODUCTION

1. For more than a decade, Dottie and Eddy Rivera have raised their children in a rented house at 326 Jefferson Avenue. It is their family home. Now the Borough of Pottstown is trying to force a warrantless, wall-to-wall search of that home—and punishing both the Riveras and their landlord, Steven Camburn, for refusing "consent." After the Riveras refused to admit a Borough inspector without a warrant, Pottstown declared their home an illegal rental and directed Steve to secure an inspection by a Borough-approved private inspector. If he does not, Pottstown threatens recurring fines, license revocation, and enforcement that could force the Riveras from their home. The Fourth Amendment does not permit Pottstown to coerce the consent it cannot obtain freely. Plaintiffs therefore seek declaratory and injunctive relief protecting the Riveras' right to insist upon voluntary consent or a valid warrant—and Steve's right not to be punished for respecting their refusal.

## THE PARTIES

2. Plaintiff Steven ("Steve") Camburn owns and operates rental properties in the Borough of Pottstown, including the house at 326 Jefferson Avenue. Steve respects his tenants' privacy and does not want to threaten or evict longtime tenants because they refuse to consent to a warrantless inspection of their homes.

3. Plaintiff Dorothy ("Dottie") Rivera has rented the house at 326 Jefferson Avenue from Steve for more than a decade. She lives there with her husband and children and considers it their family home. Dottie refuses to consent to a warrantless inspection because she does not want a stranger searching her family's private living spaces and observing the intimate details of their domestic life.

4. Plaintiff Eddy Rivera is Dottie's husband and co-tenant at 326 Jefferson Avenue. He likewise considers the property his family home and refuses to consent to a warrantless inspection of it.

5. Defendant Borough of Pottstown ("Pottstown" or the "Borough") is a municipality duly organized and existing under the laws of the Commonwealth of Pennsylvania located at 100 E. High Street, Pottstown, Pennsylvania. The Borough enacted and enforces the rental-inspection ordinances challenged in this action.

6. Defendant Keith A. Place is and was, at all relevant times, the Director of Pottstown's Licensing and Inspections Department located at 100 E. High Street, Pottstown, Pennsylvania. He is responsible for administering and enforcing the Borough's rental-inspection program and is sued in his official capacity.

7. Defendant Stephanie Drobins is an inspector with Pottstown's Licensing and Inspections Department located at 100 E. High Street, Pottstown, Pennsylvania. She oversees rental inspections and sent the enforcement letters at issue in this action. She is sued in her official capacity.

8. At all relevant times, all Defendants—including the Borough acting through its officers, employees, agents, and persons acting at its direction—acted under color of state law.

9. The challenged acts were taken pursuant to the Borough's ordinances and its official policies, practices, customs, and directives.

## JURISDICTION AND VENUE

10. This action arises under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

11. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4).

12. This Court may grant declaratory relief under 28 U.S.C. §§ 2201–02 and preliminary injunctive relief under Federal Rule of Civil Procedure 65, and permanent injunctive relief and nominal damages under 42 U.S.C. § 1983. Plaintiffs may also recover costs and reasonable attorneys' fees under 42 U.S.C. § 1988.

13. Venue lies in this Court under 28 U.S.C. § 1391 because the events giving rise to Plaintiffs' claims occurred in Pottstown, Pennsylvania, within this judicial district.

## STATEMENT OF FACTS

14. This case is the latest chapter in Pottstown's decade-long effort to enter rental homes over occupants' objections. Its 2015 Code required recurring inspections and backed

them with license loss, fines, and closure. After the Riveras refused entry, Pottstown obtained an administrative warrant, prompting a constitutional challenge in 2017. The Commonwealth Court ultimately held that Pottstown could not obtain such a warrant without individualized probable cause. Pottstown responded not by abandoning forced inspections, but by adding a mandatory third-party process through Ordinance No. 2246. Adopted on June 8, 2026, and effective September 1, 2026, that ordinance left the 2015 Code's licensing and enforcement machinery in place. The chronology matters because the new process relies on the old Code's penalties to compel the consent Pottstown can no longer obtain through its warrant practice.

## I. Pottstown's Rental-Inspection Code Prompted a 2017 Constitutional Challenge and Remains in Force.

### A. The Code requires recurring inspections and backs them with administrative warrants and escalating penalties.

15. Since 2015, the Borough of Pottstown's Municipal Code (the "Code") has required every covered rental home—however long its tenants have lived there—to undergo a "full[] inspect[ion]" every two years. Pottstown Code §§ 5-801(A)–(B), 11-206(1), (4). The Code makes that recurring inspection part of the rental-licensing process: the Department of Licensing and Inspections must inspect a home upon submission of a license application; a home that fails to complete the licensing requirements does not qualify for a license; and renewal requires compliance with every term and condition of the rental-licensing law. *Id.* §§ 5-803(1)(A), 11-205(3)–(4), 11-206(4).

16. When an owner or occupant refuses entry, the Code authorized Pottstown to seek an administrative warrant to conduct the inspection. *Id.* § 11-203(1)(I)(3). That warrant authority remains in force today.

17. An administrative warrant is not the Code's only response to refusal. At the time of the first lawsuit, the Code stated: "The penalty for not allowing an inspection shall be revocation of the residential rental license." *Id.* § 5-801(B) (2015). Ordinance No. 2246 changed that specified consequence from revocation to "non-renewal." The Code continues to require a rental license for the lawful rental and occupancy of a home by tenants. *Id.* §§ 5-801, 11-202.

18. The Code turns a tenant's refusal into a cascade of legal consequences. Unless Pottstown obtains and executes a warrant, the refusal prevents the required inspection. An uninspected home cannot satisfy the licensing requirements; a home that does not satisfy those requirements cannot receive or renew a license; and a home without a license cannot lawfully be rented or occupied by tenants. *Id.* §§ 5-803(1)(A), 11-202, 11-205(4), 11-206(4). Ordinance No. 2246 makes the final link explicit: "no rental unit may be legally occupied without a rental license." *Id.* § 11-206(6)(F). A tenant's decision to withhold consent thus leaves the owner, the home, and its occupants awash in statutory noncompliance that the owner cannot cure on their own.

19. The Code backs that cascade with sweeping punitive authority. Section 5-809(2)(B)(2) does not confine punishment to one particular licensing failure. It provides that "[w]hoever violates any provision of this Part or any Section of this Part" may, upon a first offense, be fined up to $1,000, imprisoned for up to 90 days, or both. That language reaches the several violations produced by an uncompleted inspection: failure to satisfy the licensing requirements, failure to obtain or renew a license, and the continued rental or occupancy of an unlicensed home. Following a conviction, Pottstown may prosecute each continuing violation without issuing another notice, until the violation is corrected. *Id.* § 5-809(2)(B)(3). The

Borough may also pursue civil or equitable remedies against any person or property to enforce the rental-licensing provisions. *Id.* § 5-809(2)(B)(4).

20. Nor does the $1,000 ceiling mark the end of the threatened financial exposure. Section 5-809 contains two separate monthly-penalty provisions. Under the heading "Failure to Register or Failure to Seek a Residential Rental License," subsection (2)(B)(1) provides that, after thirty days' notice, noncompliance carries "a fine of not less than $600 per residential rental unit for each month the violation exists," with each month constituting a separate violation. *Id.* § 5-809(2)(B)(1). Subsection (2)(A) imposes the same monthly minimum while a license revocation continues, although it exempts periods during which the unit is vacant and the owner is taking appropriate corrective action. *Id.* § 5-809(2)(A). Ordinance No. 2246 substituted nonrenewal for revocation as the consequence of refusing inspection but left both monthly-penalty provisions intact. An owner who cannot secure the tenant's consent thus faces a new $600-per-unit violation each month the required inspection remains incomplete and the license remains withheld.

21. The penalties do not end with Chapter 5. Pottstown's general Code Enforcement Ordinance expressly makes the Office of Code Enforcement responsible for administering and enforcing Chapter 5. *Id.* § 1-212(1). That ordinance subjects any person who violates or fails to comply with an applicable Code provision to the fine prescribed by that provision—or, upon default of payment, imprisonment for up to 30 days—and makes "each day's failure to comply" a separate offense. *Id.* § 1-215(2)(A). Continued operation without a rental license thus generates violations on two clocks: Chapter 5 makes each month a separate violation, while Chapter 1 makes each day a separate offense. And Chapter 1 does not merely authorize further

proceedings: it directs the Borough Solicitor to initiate appropriate actions at law or in equity to enforce the Code. *Id.* § 1-215(2)(B).

22. The Code's final escalation is closure. Chapter 13 applies to any person engaged in a business or occupation—or "doing anything"—for which a license is required "by the terms of any ordinance." *Id.* § 13-306. Because Pottstown requires a rental license to rent a home to tenants, continued operation without that license exposes the owner to another fine of $50 to $600, plus prosecution costs, for each day of operation and, upon default of payment, imprisonment for up to 30 days. *Id.*

23. The same chapter gives the Mayor, the Chief of Police, or, upon order, the Borough Manager "full power and authority to close any business" operated without the required license. *Id.* § 13-307. For a residential landlord, the business is the continued rental of occupied homes. The Code therefore empowers Pottstown not only to prosecute and fine the owner, but to order the rental operation closed—forcing the tenancy to end because the tenant refused a government search.

24. Pottstown aggressively enforces its rental ordinances—and publicly celebrates the resulting penalties. In May 2026, Pottstown's counsel issued a press release announcing a "[l]andmark" $62,250 judgment against a property owner. The release quoted Borough Manager Justin Keller describing the judgment as "one of the largest, if not the largest," ordinance-enforcement fines Pottstown had ever secured. It also warned other property owners that courts were prepared to impose substantial daily fines "for each applicable infraction." [1]

[1] Press Release, High Swartz LLP, *High Swartz Secures $62,250 Court-Imposed Fine for Pottstown Borough in Landmark Ordinance Enforcement Case* (May 4, 2026), https://highswartz.com/high-swartz-news/press-releases/pottstown-borough-rental-ordinance-enforcement/.

25. The "landmark" judgment did not redress unsafe housing or protect a tenant. The property was empty. The owner's offense was leaving two vacant units on Pottstown's rental registry without completing the Borough's licensing and inspection requirements. The property at 402 Beech Street contains two residential units, but no one occupied either unit during the relevant October 1, 2023–September 30, 2024 licensing period. In a February 25, 2023 filing, the owner identified the tenant in each unit as "vacant," and Pottstown received that filing three days later. Pottstown ultimately stipulated that both units remained vacant throughout the relevant licensing period.

26. But because the owner had previously registered the property as a rental and had not separately requested its removal from Pottstown's rental registry, the Borough continued to subject it to the rental-licensing regime. Drobins testified that she cited no violation of the building codes listed in Pottstown's Code and instead relied exclusively on the rental ordinances.

27. Instead, Defendant Stephanie Drobins invoked the licensing provisions themselves. She issued one citation under § 5-801 for failure to comply with the inspection procedures, a second under § 11-205 for failure to submit a completed rental-license application and fee, and a third under § 11-102 for failure to submit an annual tenancy report. The third charge carried its own penalty of $250 to $1,000, plus costs and, upon default of payment, imprisonment for up to thirty days. *See also* Pottstown Code § 11-103.

28. The Magisterial District Court imposed three separate $62,250 assessments—a total of $186,750 before costs. During the ensuing de novo appeal, Pottstown invoked § 5-809(2)(B)(1)'s monthly formula to calculate $22,800—$600 for each of two units over

nineteen months. It invoked § 1-215(2)(A)'s daily-offense provision to calculate as much as $493,000 for the incomplete application—$1,000 for each of 493 days. At closing, Borough counsel represented that the combined penalties had reached $519,800. The Court of Common Pleas found the owner guilty on all three citations but imposed a single aggregate fine of $62,250. The "landmark" judgment Pottstown celebrated was thus only a fraction of the punishment it told the court these interlocking provisions authorized.

### B. Pottstown obtained a warrant without individualized probable cause to search the Riveras' home, prompting the constitutional challenge.

29. Nearly a decade earlier, Pottstown had invoked the same inspection regime against Steve and the Riveras. The Riveras refused to consent to a search of their home. So, on March 13, 2017, the Borough obtained an administrative warrant. The supporting affidavit identified no suspected code violation. It stated only that the biennial inspection was due and that Steve had required the Borough to obtain a warrant.

30. That same day, Steve, the Riveras, and other Pottstown residents sued. They argued that the Borough's desire to conduct a regularly scheduled inspection did not constitute individualized probable cause sufficient to obtain a valid search warrant under the Pennsylvania Constitution.

### C. The resulting litigation exposed invasive searches and police coordination.

31. That litigation revealed the breadth of the searches Pottstown required. Whoever conducts an inspection, the inspector must determine whether a home complies with the International Property Maintenance Code, the Uniform Construction Code, the Fire Prevention Code, the Zoning Ordinance, every other applicable provision of the Pottstown Code, and applicable Pennsylvania law. Pottstown Code § 11-205(3).

32. Pottstown's published checklist does not limit an inspection to suspected dangers—or even claim to be complete. It warns that its requirements "may not be all inclusive" and directs inspectors to examine conditions throughout the home, including electrical outlets in every habitable space, smoke detectors in every bedroom, light bulbs in closets and above shelves, permanently affixed cabinets and shelves, and what the inspector considers an "unreasonable quantity of personal property."[2]

33. During one inspection of the Riveras' home, Borough inspectors entered the bedroom of Dottie and Eddy's daughter. After seeing one of her bras, the inspectors made fun of it. The incident showed Dottie that a rental inspection gives government officials access not merely to walls, wiring, and plumbing, but to the most personal details of her family's life.

34. Steve has also witnessed what these inspections mean in practice. Pottstown inspectors routinely open closets and cabinets and move furniture, including beds, to examine concealed areas and electrical outlets.

35. Those searches expose details having nothing to do with the condition of the property. Steve has seen how inspectors learn tenants' political and religious beliefs from items inside their homes.

36. Discovery in the first lawsuit confirmed the breadth of the intrusion. Pottstown's inspections exposed pill bottles, medical devices, religious practices, sexual orientations, and intimate personal belongings.

37. Obtaining a full picture of Pottstown's inspection program required years of discovery fights. After two court orders compelling production, the court authorized a forensic

[2] Borough of Pottstown, *Residential Rental & Property Transfer Checklist* (rev. May 2026), https://www.pottstown.org/DocumentCenter/View/105/Residential-Rental-Units-Checklist.

specialist to mirror-image the Borough's electronic files. Following hearings into Pottstown's discovery conduct, the court granted Plaintiffs' motion for sanctions.

38. Records recovered through that process led to further depositions of Borough inspectors and police officers. That evidence revealed coordination between the two departments. Inspectors had been instructed from "day one" to contact police if they saw what they believed to be drugs or drug paraphernalia. Police also had access to the Borough's rental-inspection database.

39. On at least two occasions, rental inspectors summoned police after entering tenants' homes. Those encounters resulted in police searches, seizures, and at least one criminal charge.

40. Pottstown now says its inspections are necessary to "confirm" each home's "habitability." But Pottstown previously conceded that its inspection checklist does not address habitability criteria and therefore cannot determine whether a home is habitable. Pottstown has also conceded that its Rental Inspection Program has never found a home uninhabitable.

**D. The Commonwealth Court vindicated renters' privacy rights.**

41. On December 9, 2025, a unanimous Commonwealth Court held that Article I, Section 8 requires individualized probable cause before the government may obtain a warrant to inspect an occupied rental home. *Rivera v. Borough of Pottstown,* 349 A.3d 486 (Pa. Commw. Ct. 2025), *review granted*, No. 22 MAL 2026, 2026 WL 1799427 (Pa. June 23, 2026).

42. Pottstown obtained review of that decision before the Pennsylvania Supreme Court, where briefing is currently underway. Steve, the Riveras, and the other state-court plaintiffs

welcome the opportunity to defend the Commonwealth Court's unanimous decision and obtain a definitive ruling protecting renters' privacy under the Pennsylvania Constitution. Meanwhile, the Commonwealth Court's judgment is automatically stayed during the appeal, leaving Pottstown free, for now, to continue operating its prior program.

## II. Ordinance No. 2246 Adds a Mandatory Third-Party Inspection Process.

### A. Pottstown developed a "workaround" while its appeal remained pending.

43. Pottstown did not simply await the outcome of its appeal. Even as it asked the Pennsylvania Supreme Court to restore suspicionless administrative warrants, Borough officials developed what they openly described at a Borough Council Committee of the Whole on March 4, 2026, as a "workaround" to the Commonwealth Court's decision. The workaround combines two devices: it substitutes a privately employed inspector when a tenant refuses entry to a Borough inspector, and it uses the Code's existing licensing and enforcement machinery to pressure owners and tenants to "consent" to the private inspection.

44. The first device changes the identity of the person conducting the search. Pottstown apparently believes that a private inspector hired to perform a government-mandated inspection is not bound by the Fourth Amendment.

45. The second device supplies the pressure. A tenant who continues to withhold consent prevents the owner from completing the required inspection. The owner then faces a withheld license and the accumulating penalties described above, while the tenant faces the loss of the home if Pottstown orders the rental operation closed. The workaround thus changes the means to achieve Defendants' desired objective: an inspection of the tenant's home without satisfying the Commonwealth Court's warrant standard, or, indeed, even the more relaxed warrant standard of the Fourth Amendment.

46. Before enactment, on March 10, 2026, Plaintiffs sent the Borough council a letter warning that substituting a privately employed inspector for a Borough employee would not cure the constitutional problem. Pottstown ignored that warning.

**B. Ordinance No. 2246 requires a third-party inspection after a tenant refuses the Borough entry.**

47. On June 8, 2026, Pottstown adopted Ordinance No. 2246, which took effect on September 1, 2026.

48. Ordinance No. 2246 added a third-party inspection process. Ordinarily, under the new regime, an owner may choose between the Borough's Licensing and Inspections Department and an approved third-party inspector. But once a tenant refuses a Borough inspection, the owner "shall be required" to use a third-party inspector. Pottstown Code § 11-206(6).

49. The landlord cannot consent for the tenant. Before the third-party inspection may occur, the landlord must obtain written consent from every tenant occupying the unit. *Id.* § 11-206(6)(F).

50. Another refusal does not relieve the landlord of the inspection requirement. The ordinance expressly provides that failure to obtain the tenant's consent "shall not alleviate" the landlord's obligation to satisfy every licensing requirement, including passing the inspection. *Id.*

51. The newly enacted third-party provision declares the consequence for the tenant: "no rental unit may be legally occupied without a rental license." *Id.* § 11-206(6)(F).

52. Thus, once a tenant refuses the Borough entry, the landlord must return with Pottstown's approved substitute and secure the tenant's written consent. If the tenant again

refuses, the inspection remains incomplete, the license cannot issue, and the tenant cannot legally remain in the home.

### C. Pottstown controls the supposedly independent inspection.

53. The third-party inspector does not perform a private task. Pottstown requires the inspection, determines who may perform it, prescribes what the inspector must examine, demands the resulting report, and retains ultimate authority to decide whether the home complies with Borough law.

54. Before hiring the inspector, the landlord must obtain Pottstown's preapproval. The landlord must submit proof of the inspector's qualifications and insurance together with a signed contract for the inspection. Pottstown Code § 11-206(6)(A)–(B).

55. The inspector must submit a report to Pottstown under penalty of perjury. *Id.* § 11-206(6)(C)–(D).

56. Pottstown remains the "ultimate authority" over compliance. It may reject, demand supplementation of, or override the inspector's report. It may also require additional inspections and repairs before issuing the license. *Id.* § 11-206(6)(G)–(H).

### D. Pottstown makes the landlord pay for its substitute inspector.

57. The landlord bears every cost charged by the third-party inspector. *Id.* § 11-206(6)(E). The landlord must also pay Pottstown a $65 processing fee for each third-party report.

58. The Borough charges two separate fees during each licensing cycle. Its fee schedule imposes a $10 biennial license-application fee and a separate inspection fee—currently $140

per unit for a single-family home or duplex. Borough of Pottstown, 2026 Schedule of Fees, Licensing & Inspections—Rentals ¶ 3(a)–(b).

59. The Borough does not maintain a list of qualified third-party inspectors. Nor do the Borough's communications identify a process for identifying or retaining a third-party inspector.

60. Steve has nevertheless tried to locate an inspector who satisfies Pottstown's requirements. To that end, he searched online for rental-inspection companies in Pottstown and Montgomery County, but his searches principally returned residential home inspectors and did not identify anyone with the qualifications Pottstown requires. He contacted realtors and other landlords in Pottstown and surrounding municipalities. The realtors, in turn, made inquiries of home inspectors, but those inquiries likewise produced no qualified inspector. Other Pottstown landlords whose tenants had refused Borough inspections likewise told Steve that they had found no way to proceed under the new process.

61. As of filing, Steve's search has produced neither a qualified inspector nor a price quote—much less the signed inspection contract Pottstown requires by September 30. Pottstown has supplied neither a list of qualified inspectors nor any assistance locating one. It has instead placed on Steve the burden of finding an unidentified professional who meets the Borough's requirements, securing a contract with that person, and completing the inspection by December 1.

### III. Pottstown Applies the New Third-Party Process—and the Code's Existing Enforcement Threats—to Steve and His Tenants.

62. Pottstown has now directed Steve to use the new third-party process at fifteen of his rental properties and threatened enforcement if he cannot complete it. The tenants at those

properties had previously refused entry to Borough inspectors. Those refusals occurred at different times during earlier inspection cycles; they were not a collective response to Ordinance No. 2246.

**A. Steve paid every inspection fee Pottstown invoiced.**

63. Pottstown charges a $140 inspection fee for each rental unit, separate from its $10 biennial license-application fee. Of the fifteen properties at issue, Pottstown invoiced Steve for inspections at thirteen properties containing at least fourteen rental units. One property, 121 North Franklin Street, contains two units. Pottstown therefore charged Steve at least $1,960 in inspection fees for those thirteen properties.

64. On August 15, 2025, Steve wrote separate $140 inspection-fee checks for 32 and 50 East Second Street; Pottstown deposited them on August 27. On January 20, 2026, he wrote separate $140 inspection-fee checks for 464 and 464½ North Evans Street; Pottstown deposited them on January 26. On January 25, Steve wrote another $140 inspection-fee check for 329 Jefferson Avenue; Pottstown deposited it on February 10.

65. On February 22, 2026, Steve wrote two $20 checks for the separate $10 application fees associated with 32 and 50 East Second Street and 464 and 464½ North Evans Street. Pottstown deposited both checks on March 11. Steve also paid $150 for 573 Lincoln Avenue on February 27, $150 for 421 May Street on March 10, and $150 for 111 North Evans Street on March 25. Each $150 payment included the $140 inspection fee and $10 application fee. Pottstown had deposited all three checks by April 9.

66. On April 1, 2026, Steve paid $150 for 171 North Franklin Street and $300 for the two units at 121 North Franklin Street. On April 15, he paid $150 each for 318 and 407 Lincoln

Avenue. Pottstown deposited the April 1 checks on April 13 and the April 15 checks on May 4. Finally, on July 13, Steve paid $150 for 434½ Cherry Street; Pottstown deposited that check on July 24.

67. Between August 15, 2025, and July 13, 2026, Steve paid every inspection fee Pottstown invoiced for those thirteen properties—a total of at least $1,960. Pottstown's invoices describe payment as the step initiating the inspection process: "[u]pon receipt of payment," Pottstown will contact the owner to schedule the inspection. Yet no Borough inspection occurred at any of those thirteen properties during the current inspection cycle, and Pottstown has not refunded or credited any of Steve's payments.

68. Through September 15, 2026, Pottstown had not sent Steve an inspection invoice for the Riveras' home at 326 Jefferson Avenue. On March 24, 2025, Pottstown mentioned the property in an email responding to Steve's unrelated request for a rental license for 856 Queen Street. It stated that a "finance check" showed $365 in "outstanding rental fees" associated with 326 Jefferson and that "[r]ental licenses cannot be released at this time." But Pottstown did not itemize that amount, send Steve the underlying invoices, demand payment, or otherwise pursue collection.

69. Pottstown likewise has not invoiced Steve for an inspection at 644 Walnut Street. That property is located in a different inspection zone, and its next inspection is not yet due. Nevertheless, Pottstown included 644 Walnut among the fifteen properties it declared "operating illegally" and directed Steve to place into the new third-party process.

70. On September 15, 2026, Steve asked Pottstown to identify every outstanding charge for 326 Jefferson Avenue and provide an itemized balance. The next day, Finance Director

Marley Boone informed him in writing that the Finance Department had "no open balances" for the property and directed him to Licensing and Inspections.

71. On September 17, Licensing and Inspections produced five invoices. It soon acknowledged that one had already been paid and identified four remaining invoices totaling $170: a $140 inspection fee and three $10 rental-registration fees. Within hours, Steve paid all four electronically. He expressly informed Pottstown that the payment was solely for the invoiced fees and did not constitute consent by him or any occupant, withdraw the Riveras' prior refusal, authorize entry, or signify agreement to participate in the third-party process. Licensing and Inspections confirmed receipt of the payments.

72. Steve has thus paid every charge Pottstown identified for the Riveras' home. Yet Pottstown's letter does not identify an unpaid fee as the reason the property remains unlicensed. It declares the property "operating illegally" because the Riveras refused a Borough inspection and directs Steve to obtain a third-party inspection instead. No unpaid charge identified by Pottstown stands between Steve and the license; what remains is Pottstown's demand for an inspection the Riveras refuse.

73. None of Pottstown's fifteen third-party letters identifies an unpaid inspection fee as the reason a property remains unlicensed. Instead, each letter states that Pottstown withheld the license because the tenant refused a Borough inspection. Nor do the letters offer to refund or credit the inspection fees Steve previously paid for Borough inspections that never occurred.

74. Pottstown instead requires Steve to hire and pay private inspectors and to pay another $65 processing fee for each affected unit. Because the fifteen properties contain at least sixteen units, those new Borough fees total at least $1,040—on top of the $1,960 Steve has

already paid, the $170 he paid to satisfy every invoice Pottstown identified for 326 Jefferson Avenue, and whatever the private inspectors charge. Yet even after paying those amounts, Steve cannot obtain the licenses without his tenants' written consent.

### B. Pottstown invoked tenants' earlier refusals to compel the new third-party process.

75. Pottstown identified the fifteen properties based on tenant refusals that occurred at different times during earlier inspection cycles and depending where the properties fell within the Borough's eight inspection "zones." All fifteen refusals occurred before Ordinance No. 2246 took effect on September 1, 2026. They were not a collective response to the new ordinance.

76. The Riveras have refused a warrantless inspection of their home since 2017. Tenants at 32 and 50 East Second Street refused scheduled Borough inspections during an earlier inspection cycle. The tenant at 434½ Cherry Street refused entry more than two years before Pottstown's July 2026 enforcement notice concerning that property; the tenant did not refuse an inspection during the cycle that produced the July notice. And the next inspection for 644 Walnut Street was not yet due when Pottstown directed Steve to use the third-party process.

77. In earlier inspection cycles, Pottstown sometimes responded to tenant refusals at Steve's properties by seeking and obtaining administrative warrants. It did so at the Riveras' home in 2017 and, in later cycles, at other properties Steve owned.

78. Pottstown has not sought an administrative warrant for any of the fifteen properties during the current inspection cycle. Instead, when the tenants refused entry, the Borough inspections did not occur, Pottstown withheld the corresponding rental licenses, and Pottstown ultimately directed Steve into the new third-party process.

79. By September 2, 2026, Defendant Stephanie Drobins had mailed Steve fifteen substantively identical letters—one concerning each of fifteen properties. Pottstown put no date on any of them, even though each imposed fixed compliance deadlines backed by threatened enforcement. The fifteen undated letters are attached as Exhibit **A**.

80. Each letter declares that the identified property "is operating illegally" because Steve "failed to obtain a rental license" after his "tenant refused an inspection of the residential rental unit" by a Borough inspector.

81. The letters do not invite Steve to schedule another Borough inspection if a tenant reconsiders. Instead, they direct him to the new third-party process as the means of obtaining the withheld licenses. Steve confirms that, after the earlier refusals, Pottstown never offered another option until it presented third-party inspections as a new option in 2026.

82. By September 30, 2026, Steve must notify Pottstown that he intends to use the third-party process. For each property, he must submit an application identifying the proposed inspector, documents establishing the inspector's qualifications and insurance, a signed inspection contract, and a $65 processing fee for each unit. He must then "secure a rental license" by December 1, 2026, by obtaining every tenant's written consent, completing the inspections, ensuring that every property passes, and submitting the inspectors' reports to Pottstown.

83. Steve cannot complete that process on his own. His tenants control access to their homes, and Ordinance No. 2246 requires their written consent before a third-party inspector may enter. None of the fifteen letters states that Pottstown has sought or obtained a warrant.

Instead, each directs Steve to obtain a third-party inspection and warns that enforcement will follow if he does not complete every step of the process.

### C. Pottstown has expressly threatened enforcement if Steve respects his tenants' refusals.

84. Pottstown leaves no uncertainty about the consequences if Steve does not complete the third-party process. Each letter warns: "Failure to follow through with any part of this letter will result in the issuance of a notice of violation and enforcement will follow accordingly."

85. Defendant Drobins sent one of those letters concerning the Riveras' home at 326 Jefferson Avenue. Since 2017, no one from Pottstown had asked either Steve or the Riveras anew for consent, attempted to schedule another Borough inspection, or sent an inspector to the property. Pottstown likewise had not sought a new administrative warrant. Instead, the letter invoked the Riveras' earlier refusal and declared the property "operating illegally."

86. The letter directed Steve to place the Riveras' home into the new third-party process. It required him, by September 30, to submit a completed application, documentation of the inspector's qualifications and insurance, a signed inspection contract, and a $65-per-unit processing fee. It then required him, by December 1, to "secure a rental license" by producing documentation showing that the third-party inspection "took place and passed." The letter warned that "[f]ailure to follow through with any part of this letter will result in the issuance of a notice of violation and enforcement will follow accordingly."

87. Pottstown's written "Property Owner Responsibilities," updated December 17, 2025, identifies what that enforcement may include: "citations, placards, rental license revocation, court injunctions," posted notices, and other measures. The instructions emphasize, in bold and underlined type, that "**[o]btaining partial compliance does not stop**

**the collections process**." Pottstown mailed these instructions to Steve with its invoices for his properties.

88. Pottstown has therefore declared fifteen of Steve's properties illegal, imposed deadlines for completing third-party inspections, and promised enforcement if he cannot obtain his tenants' consent. That threat remains even if Steve pays every fee and completes every step within his own control.

**D. Pottstown's prior enforcement against Steve shows what its present threats mean.**

89. Pottstown's promised "notice of violation" is neither unfamiliar nor undefined. In separate enforcement matters involving Steve's rental properties, the Borough has issued formal violation notices, posted notices where tenants could see them, threatened substantial monthly fines, and ordered that occupied units be vacated.

90. On July 10, 2026, Drobins emailed Steve a collection letter and formal notice concerning 434½ Cherry Street. At that time, Pottstown asserted that the $140 inspection fee and the separate $10 license-application fee remained unpaid and that the occupied property lacked a rental license.

91. Steve subsequently paid the $150 intended to satisfy the $140 inspection fee and separate $10 license-application fee for 434½ Cherry Street, identified in the July 10 correspondence. Pottstown deposited his check on July 24, 2026.

92. Payment did not itself produce a license because the inspection had not occurred. The formal notice declared that the property was being leased or occupied without a rental license and directed that, within 15 days, any occupied unit without a license "must be vacated pending the issuance of a license."

93. The same notice threatened Steve with a minimum fine of $600 per residential rental unit for every month the violation continued. It also threatened continuing prosecution and civil or equitable proceedings.

94. Pottstown has also posted violation notices where Steve's tenants could see them. On February 20, 2026, the Borough posted an orange "Notice of Outstanding Violation" on the door of 464½ North Evans Street. The notice asserted that the property had unspecified "outstanding violations," directed any occupant to notify the owner, and warned that failure to rectify the matter "could result in further legal action." Steve contacted Licensing and Inspections that day to ask what violation had occurred.

95. A February 20, 2026 collection letter concerning that property acknowledged that Pottstown had received the $140 inspection fee. It asserted, however, that the inspection had not been scheduled and that the separate $10 license-application fee remained outstanding. The letter warned that enforcement could include additional posted notices, citations, placarding the property as uninhabitable, license revocation, and court proceedings.

96. Steve thereafter issued one of the February 22 checks described above to cover the separate $10 application fees for 464 and 464½ North Evans Street. Pottstown deposited the check on March 11, 2026.

97. Five days later, Pottstown posted the same form notice at 329 Jefferson Avenue. The tenant discovered it and emailed a photograph to Steve. When Steve asked Licensing and Inspections to identify the violation, the Borough responded that the $10 rental-license application fee had not been paid and that the property was due for a rental inspection.

## IV. Injury to Plaintiffs.

### A. The Riveras face losing their longtime home if they continue withholding consent.

98. Dottie and Eddy—not Steve and not Pottstown—have the right to decide whom to admit into their home. They have refused both a Borough inspection and a Borough-mandated third-party inspection without a warrant, and they intend to continue withholding consent.

99. Dottie and Eddy have lived at 326 Jefferson Avenue for more than a decade. They have raised their children there and consider it their family home. They were not planning to move, do not want to move, and intend to remain there.

100. The Riveras value their privacy. They do not want a government agent searching private areas of their home, including their bedroom, bathrooms, children's rooms, closets, cabinets, and personal belongings.

101. Dottie knows from experience how personally invasive a Pottstown inspection can become. During a prior inspection, Borough inspectors entered her daughter's bedroom, saw one of her bras, and made fun of it. Dottie does not want a Borough inspector—or a Borough-approved substitute—again examining and commenting upon the intimate belongings in her family's home.

102. On September 15, 2026, Dottie and Eddy confirmed in writing that they do not consent to either a Borough inspection or a third-party inspection without a warrant. That consent is theirs alone to give or withhold. Steve cannot consent on their behalf, and Ordinance No. 2246 itself requires their written consent before a third-party inspector may enter.

103. The Riveras are already subject to the challenged policy. Because they refused inspection, Pottstown has withheld the license for their home, officially declared the home an

illegal rental, imposed deadlines for obtaining a substitute inspection, and promised a notice of violation and enforcement if the process is not completed.

104. If the Riveras continue withholding consent, the inspection cannot occur, the license cannot issue, and Pottstown considers their continued occupancy illegal. As Pottstown's prior enforcement against Steve demonstrates, the threatened consequences include posted notices, substantial recurring fines, license action, court proceedings, and an order that the occupied home be vacated.

105. Pottstown has thus placed the Riveras under immediate pressure to surrender access to their home or risk losing it. They also do not want Steve fined or otherwise punished for respecting their decision. That pressure exists now, even though Pottstown has not yet posted a notice at their home, imposed a fine, or ordered them to leave.

**B. Pottstown's inspection ultimatum is causing Steve immediate harm.**

106. Steve respects the Riveras' decision and the similar decisions of his other tenants. He intends to continue renting to them and will not threaten, pressure, or evict them for refusing a warrantless inspection.

107. The September 30 deadline requires Steve to act now. For the Riveras' home alone, Steve must enter into a third-party inspection contract, submit the required materials, and pay Pottstown a $65 processing fee. By December 1, he must demonstrate that the home passed the third-party inspection—a result he cannot obtain without the Riveras' written consent. Across all sixteen affected units, the Borough's processing fees total at least $1,040, exclusive of the private inspectors' separate charges. If Steve instead respects his tenants' continuing refusals, Pottstown has promised that notices of violation and enforcement will follow.

108. Steve's threatened exposure at the Riveras' home alone is substantial. After thirty days' notice, Pottstown Code § 5-809(2)(B)(1) authorizes a fine of at least $600 per residential rental unit for each month the licensing violation continues, with each month constituting a separate violation. Thus, Pottstown could seek at least $600 from Steve for each month it treats the occupied Rivera home as unlicensed. Section 5-809(2)(B)(2) separately authorizes, for each violation, a fine of up to $1,000, imprisonment for up to 90 days, or both. Applied across all sixteen affected units, the monthly minimum alone would total at least $9,600.

109. These threats force Steve into an immediate and intolerable choice: pressure his tenants to surrender access to their homes, remove them from those homes, or continue renting to them while facing escalating fines and enforcement.

110. Each option injures Steve. Pressuring his tenants would violate his principles and damage longstanding personal and business relationships. Ending their tenancies would deprive him of rental income and displace people whose rights he respects. Continuing the tenancies exposes him to the enforcement Pottstown has promised.

111. The threat is credible. Pottstown aggressively enforces its rental ordinances, recently obtained a $62,250 judgment against another landlord, has previously issued and posted formal violation notices at Steve's properties, and has warned Steve that enforcement "will follow" if he does not comply with every part of its inspection ultimatum.

### C. Plaintiffs' injuries are imminent, caused by Pottstown, and redressable by this Court.

112. The September 30, 2026, deadline is imminent. Pottstown's declaration that the homes are illegal, its present demands for compliance, and its promised enforcement are

causing all three Plaintiffs continuing anxiety and distress. Dottie and Eddy are already living under pressure to choose between an unwanted search and the security of their longtime home. Steve is already living under pressure to choose between protecting his tenants and exposing himself to escalating enforcement.

113. Nor would meeting the September 30 deadline defer the threatened injury indefinitely. Pottstown has ordered Steve, by December 1, 2026, to produce documentation establishing that a third-party inspection of the Riveras' home "took place and passed." As of filing, only 64 days remained for Steve to obtain the Riveras' written consent and complete an inspection they have repeatedly refused.

114. Plaintiffs' injuries are caused by Pottstown's policies of withholding rental licenses, declaring occupied homes illegal, imposing compliance obligations, and threatening further enforcement when tenants refuse a warrantless inspection.

115. A declaration that those policies violate the Fourth Amendment, together with an injunction prohibiting Defendants from enforcing them, would relieve the pressure upon the Riveras to submit to an inspection and eliminate the threatened enforcement against Steve for respecting their decision.

## Count I
## Violation of U.S. Const., Am. IV
## 42 U.S.C. § 1983
## (Against All Defendants)

116. Plaintiffs re-allege and incorporate every preceding allegation.

117. At all relevant times, Defendants acted under color of state law.

118. The Fourth Amendment prohibits unreasonable searches of the home. Its protections apply to state and local governments through the Fourteenth Amendment.

119. Dottie and Eddy possess the Fourth Amendment right to decide whether to admit an inspector into their home. A government inspection of their occupied home is a search. For a routine rental inspection unsupported by a valid warrant, the government must obtain the occupants' free and voluntary consent.

120. Consent produced by official threats, penalties, or coercion is not voluntary. The government may not obtain consent to enter a home by threatening the occupants with the loss of that home or by threatening their landlord with punishment for respecting their refusal.

121. Pottstown cannot evade the Fourth Amendment by directing a nominally private inspector to perform the search. Pottstown requires the third-party inspection, approves the inspector, prescribes the inspection's scope, requires the resulting report, and retains ultimate authority to reject the report and demand further entry. An inspection conducted under that governmental direction and control is a government search.

122. First, Pottstown Code §§ 5-801(A)–(B) and 11-206(1), (4) condition the issuance or renewal of a rental license upon completion of a government-mandated inspection. Those provisions violate the Fourth Amendment insofar as Pottstown uses them to withhold a license because an occupant refuses an inspection unsupported by either a valid warrant or voluntary consent.

123. Second, Pottstown Code § 5-801(B) makes nonrenewal of the rental license the "penalty for not allowing an inspection." That provision violates the Fourth Amendment insofar as Pottstown uses the threatened loss of the license to pressure an occupant into consenting to a warrantless inspection.

124. Third, Pottstown Code § 11-206(6) requires the landlord, after an occupant has refused a Borough inspector, to retain a Borough-approved third-party inspector. Section 11-206(6)(F) then requires the landlord to obtain the occupant's written consent before that inspector may enter. Those provisions violate the Fourth Amendment insofar as Pottstown uses the mandatory third-party process to obtain the warrantless entry the occupant has already refused the Borough.

125. Fourth, Pottstown Code § 11-206(6)(F) provides that the occupant's continued refusal "shall not alleviate" the landlord's obligation to complete the inspection and that "no rental unit may be legally occupied without a rental license." That provision violates the Fourth Amendment insofar as Pottstown conditions the occupant's ability to remain in the home upon surrendering consent to a warrantless search.

126. Fifth, Pottstown Code § 5-809 and Pottstown's related enforcement policies authorize fines, continuing prosecutions, license action, vacancy orders, civil proceedings, and other enforcement against properties that Pottstown considers unlicensed or illegally occupied. The Fourth Amendment does not permit Pottstown to fine or otherwise punish the Riveras for refusing a warrantless search of their home—or to punish Steve because the Riveras exercised that right. Those provisions and policies violate the Fourth Amendment insofar as Pottstown invokes or threatens those consequences against an owner or occupant because the occupant refuses to consent to a warrantless Borough or Borough-mandated third-party inspection.

127. These provisions do not offer the Riveras a voluntary choice. Taken together, they require an inspection of their home, deny the rental license when they refuse entry, prohibit them from legally remaining without that license, direct Steve to return with a Borough-

approved substitute, and promise enforcement if he cannot secure their consent. Consent obtained under that inspection ultimatum would be the product of official coercion, not a free and voluntary decision by the Riveras.

128. Ordinance No. 2246, the underlying licensing provisions, and Pottstown's related enforcement practices are official municipal policies. Place and Drobins administer and enforce those policies under color of state law.

129. Defendants have applied those policies to Plaintiffs. They have withheld the licenses for the affected properties, declared the occupied homes illegal, required Steve to pursue third-party inspections, imposed compliance deadlines, and promised notices of violation and enforcement if he does not overcome his tenants' refusals.

130. An actual controversy exists between Plaintiffs and Defendants concerning whether Defendants may condition rental licensing and lawful occupancy upon consent to a warrantless inspection and punish an owner or occupant when the occupant refuses consent. Plaintiffs seek a declaration resolving that controversy under 28 U.S.C. §§ 2201–02.

131. Unless Defendants are enjoined, Plaintiffs will continue suffering the injuries described above and will face the enforcement Pottstown has promised. Plaintiffs seek preliminary injunctive relief under Federal Rule of Civil Procedure 65.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

**A.** Declare that an inspection performed by a third-party inspector pursuant to Pottstown Code § 11-206(6) is a government search subject to the Fourth Amendment;

**B.** Declare that Pottstown Code §§ 5-801(A)–(B) and 11-206(1), (4), and (6), individually and in combination, violate the Fourth Amendment insofar as they condition the issuance or renewal of a rental license—or an occupant's continued lawful occupancy—upon consent to a Borough or Borough-mandated third-party inspection unsupported by a valid warrant;

**C.** Declare that Defendants violate the Fourth Amendment when, because an occupant refuses to consent to a Borough or Borough-mandated third-party inspection unsupported by a valid warrant, they withhold, deny, decline to renew, suspend, or revoke a rental license; declare a rental home illegally occupied; order an occupant to vacate; or impose or threaten fines, prosecution, or other enforcement against an owner or occupant;

**D.** Preliminarily and permanently enjoin Defendants, their officers, employees, agents, servants, attorneys, and all persons acting in concert with them from enforcing Pottstown Code §§ 5-801(A)–(B), 5-809, and 11-206(1), (4), and (6) against Plaintiffs or with respect to any of Camburn's fifteen identified rental properties by withholding, denying, declining to renew, suspending, or revoking a rental license; declaring a rental home illegally occupied; ordering an occupant to vacate; or imposing or threatening fines, prosecution, or other enforcement against an owner or occupant because the occupant refuses to consent to a warrantless inspection by the Borough or a Borough-mandated third-party inspector;

**E.** Award Plaintiffs nominal damages for the violation of their constitutional rights;

**F.** Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

**G.** Award such other equitable relief as the Court deems just and proper.

/s/ *Tara A. Horvath*
Tara A. Horvath, Esq (PA Bar No. 314376)
FAHERTY LAW FIRM
75 Cedar Avenue
Hershey, PA 17033
(717) 256-3000
thorvath@fahertylawfirm.com

Robert Peccola (FL Bar No. 0088772)*
Jeffrey Redfern (MN Bar No. 394802)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
rpeccola@ij.org
jredfern@ij.org

James Odell (FL Bar No. 101396)*
INSTITUTE FOR JUSTICE
2 South Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600
jodell@ij.org

**Applications for admission pro hac vice to be filed*

*Attorneys for Plaintiffs*

**VERIFICATION**

I affirm under penalty of perjury that paragraphs ¶¶ 4, 98–100, and 102–105 of the foregoing VERIFIED COMPLAINT, are true and correct to the best of my knowledge, information, and belief.

Executed on 09/23/2026

Eddy Omar Rivera
Eddy Omar Rivera

**VERIFICATION**

I affirm under penalty of perjury that paragraphs ¶¶ 3, 33, and 98–105 of the foregoing VERIFIED COMPLAINT, are true and correct to the best of my knowledge, information, and belief.

Executed on 09/23/2026

Dorothy Rivera
Dottie Rivera

**VERIFICATION**

I affirm under penalty of perjury that paragraphs 2, 29–30, 34–35, 42, 46, 59–97, and 106–113 of the foregoing VERIFIED COMPLAINT, are true and correct to the best of my knowledge, information, and belief.

Executed on 9/21/2026.

Steven Camburn